**DeSILVA CONSTRUCTION CORP., a Florida corporation, Plaintiff,**

v.

**Arthur E. HERRALD and J. Alice Herrald, husband and wife, and Eugene R. DeAngelis, Defendants.**

**DeSILVA CONSTRUCTION CORP., a Florida corporation, Plaintiff,**

v.

**Calvin LaHURD and Margaret LaHurd, husband and wife, and Edwin Wentzel, Jr., Defendants.**

Civ. Nos. 4146, 4145.

United States District Court
M. D. Florida,
Tampa Division.

Dec. 5, 1962.

Ezra J. Regen, Sarasota Fla., for plaintiff.

Carrol F. Dillon, of Wood & Scheb, Sarasota, Fla., for defendants.

LIEB, District Judge.

These cases, consolidated for trial by a previous order of this Court, came on

for final hearing upon the complaint filed by the plaintiff, DeSilva Construction Corp., a Florida corporation, claiming an infringement of a copyright of an architectural plan entitled "McCall Colonial Ranch," allegedly owned by the plaintiff, and unfair competition, and upon the answer filed by the defendants, respectively, denying all material allegations of the complaint, and upon the counterclaim filed by the defendant, Eugene R. DeAngelis, in case No. 4146 Civ.T.

The Court heard testimony of witnesses and considered the evidence submitted in these cases, together with the briefs of counsel for the respective parties; and the cases are now ripe for final determination.

The record reveals that a corporation named "DeSilva Construction Corporation" was for many years engaged in the construction of family homes in New York State, the state of its incorporation. This corporation, which is not the plaintiff, will be referred to hereinafter as the "New York corporation." Frank Weissman was its president and the other two members of his family, his son, Alan, and his wife, Myrtle, constituted the other officers and all of the stockholders of said corporation. Sometime during the summer of 1960, Frank Weissman moved to Sarasota, Florida, with his family. Shortly thereafter, Alan Weissman prepared some sketches and drawings of a one-story dwelling while still in the employ of the New York corporation. A draftsman named Williamson thereafter prepared a set of architectural plans from said sketches and drawings for the New York corporation.

On November 21, 1960, Frank Weissman, as owner, applied for a building permit from the City of Sarasota, Florida, to build a house on Lot 11, Block 2, Bird Key Subdivision, Sarasota, Florida, otherwise described as 242 Robin Drive, Sarasota, Florida. The said application for the building permit was signed by Frank Weissman in the capacity of owner, and was also signed by Frank Weissman in the capacity of builder of the proposed structure. On November 22, 1960, the Building Inspection Department of the City of Sarasota, through H. J. Russell, Chief Building Inspector, issued the requested permit for the construction of said house and said building permit cited Frank Weissman as builder and owner. The building permit mentioned was issued pursuant to ordinance No. 628 of the City of Sarasota, Florida, which ordinance was enacted under the City Code, providing for permits for "sole owners." In connection with this application, Frank Weissman filed with the Building Inspection Department of the City of Sarasota the said set of plans designed by his son, Alan Weissman, on November 22, 1960. Said plans did not reflect any indication that they were copyrighted, and there was no statutory copyright notice affixed to said plans.

Frank Weissman began construction of a three-bedroom family home, utilizing the plans previously mentioned, sometime in December, 1960. The material and labor for said construction was paid by the DeSilva Construction Corporation, the New York corporation, and the actual work of construction was performed by various subcontractors. The evidence is uncontradicted that said subcontractors had free access to the architectural plans of the house for use in the performance of their respective jobs, and at least six of said subcontractors were given complete copies of said architectural plans. The record is devoid of any evidence that any of the subcontractors were admonished or put on notice that the plans were the sole exclusive property of anyone, especially of the DeSilva Construction Corporation, the New York corporation, or that the said plans were protected by any copyright. As previously mentioned, neither the original plans deposited with the City of Sarasota, nor the copies of the plans, reflected a statutory copyright notice. Construction of said house was completed on February 14, 1961. Title to said house was at no time in the New York corporation, and it was sold

directly by Frank Weissman to third parties sometime in May, 1962. At no time during the period of construction of said house was the public barred or prohibited from viewing or inspecting the features of said house.

On the 14th day of February, 1961, the public was invited to view and inspect said house as a model house. Beginning on February 16, 1961, and for sometime thereafter, a guest book was kept at the model house by Alan Weissman, showing that a large number of people visited the model house. The record shows that there were no restrictions whatsoever upon such visitors, and none were advised that the architectural plans to the model house were protected by copyright. On February 26, 1961, the Weissmans caused an advertisement to be inserted in the "News," a newspaper of general circulation in the Sarasota area, depicting a picture and floor plan of the said house built on the above mentioned location entitled the "McCall's Colonial." Said advertisement failed to show any notice of copyright or any language indicating that the plans from which the house was built were claimed to have been protected by copyright of any kind.

Sometime toward the end of March, 1961, Alan Weissman instructed Williamson, the draftsman, to revise the set of plans which were originally deposited in the Building Inspection Department of the City of Sarasota, in order to conform them to the model house as the same was actually built; and on or about that time, after Williamson completed this revision, Alan Weissman instructed him to affix a notice of copyright on said revised plans. Shortly thereafter, Alan Weissman caused said revised set of plans to be mailed to the United States Copyright Office at Washington, D. C., together with an application for a certificate of copyright on said plans. At no time did the New York corporation publicly distribute, sell, give away or circulate said revised plans, or the original plans; and the record is totally devoid of any evidence that there was any publication, public distribution, sale or circulation on behalf of the New York corporation of said revised plans.

On May 8, 1961, the Copyright Office issued a certificate of registration of a claim to copyright in the said drawing. The certificate of registration bore registration number I p 5536, Class I. The certificate reflects the name of the claimant of the copyright as DeSilva Construction Corp., P. O. Box 2386, Sarasota, Florida. The title of the work was designated as "The McCall Colonial Ranch" and the author of said architectural drawings as Alan Weissman with residence at 2921 Bentley Road, Sarasota, Florida. The certificate of registration further reflects that the claimant claimed the copyright in a published work allegedly published by the DeSilva Construction Corporation of Sarasota, Florida, and indicates as the first date of publication the date of March 30, 1961. Although there is no indication whether or not the claimant was the New York corporation, it is reasonable to infer that it was, inasmuch as the record and testimony reveal that the New York corporation had maintained at that time a post office box in Sarasota, Florida, and the plaintiff, a Florida corporation, was not then in existence.

Mrs. J. Alice Herrald, one of the defendants in case No. 4146 Civ. T., visited the model house on Bird Key in the early state of construction sometime in January, 1961. At that time she inquired about a proposed purchase price on the house, but Frank Weissman, who was at the site of construction at that time, stated that he could not quote a price since the cost of construction was not yet finally determined. When the model house was opened to the public, Mrs. Herrald again visited it and evinced a great interest in purchasing a house of that type. She discussed the price with a salesperson on the premises on several occasions. However, she could not come to terms with the representative of the New York corporation on the premises. In early February, 1961, Mrs. Herrald contacted Eugene R. DeAngelis, one of the defendants in case No. 4146

Civ. T., who is a general contractor in the City of Sarasota, Florida, and discussed the possibility of having a house built. The defendant, DeAngelis, commenced to draw his preliminary plans and sketches. Afterwards, he left some drawings and magazine clippings with Mrs. Herrald in order to help her decide the type of house she wanted him to build. The defendant, DeAngelis, then prepared a set of plans for the proposed construction of the house in accordance with directions given to him by Mrs. Herrald; and his building plans were completed and finalized shortly before March 7, 1961.

On March 7, 1961, a contract to construct a home for the Herralds was signed between the defendant, DeAngelis, and defendants Mr. and Mrs. Herrald. Mr. Herrald immediately took the plans to a lending institution in St. Petersburg, Florida, for an appraisal and for the purpose of obtaining the necessary funds for the construction of the proposed house. DeAngelis did not at that time file said set of plans in the Building Inspection Department of the City of Sarasota, since he was waiting for the approval of the construction loan. The defendant, DeAngelis, distributed his proposed plan of construction to various subcontractors in order to obtain bids from them for the jobs which he planned to let out on subcontract on said construction.

On April 5, 1961, defendant DeAngelis submitted his final plans of construction to the Health Department of the City of Sarasota, which in turn forwarded the same to the Building Department where the said plans were filed and approved and a building permit for the construction of the Herrald house was issued in due course to the Herralds. Neither of the defendants, Mr. or Mrs. Herrald, nor the defendant, Eugene R. DeAngelis, ever saw any architectural plans or drawings of the Weissman house with any statutory notice of copyright on it at any time prior to the completion of their house. During the negotiations between DeAngelis and defendants Mr. and Mrs. Herrald, defendant DeAngelis visited the plaintiff's model house at Bird Key at the request of Mrs. Herrald on two different occasions. On none of these occasions was he advised by anyone that the model house was protected in any way by any copyright or that the plans from which the model house was built were protected by copyright. He was not given, or shown, on these occasions any part of the plans from which that house was built; and there is no evidence in the record that defendant DeAngelis, or defendants Mr. and Mrs. Herrald, ever saw the noncopyrighted plans for plaintiff's house deposited in the Building Department of the City of Sarasota by Frank Weissman in November, 1960.

Mrs. LaHurd, one of the defendants in case No. 4145 Civ. T., visited plaintiff's model house sometime in February, 1961, shortly after the same was opened for public inspection. She expressed interest and her liking of the house to the salesperson on the premises and inquired about details. She told the sales representative, Mrs. McComb, that she would like to have a four-bedroom house built and inquired about the possibility and cost of building a four-bedroom house rather than the model house which had only three bedrooms. At her request, Alan Weissman prepared a floor plan with four bedrooms; but the parties could not agree on price and the negotiations and discussions were shortly thereafter abandoned by Mrs. LaHurd. On the occasions of her discussions, Mrs. LaHurd was not advised by the sales representative, or by Alan Weissman or anyone else, that the model house, or the plans from which it was built, were protected by copyright; and the first time Mrs. LaHurd was advised of this fact was when Mrs. McComb called her the latter part of April, 1961, on the telephone and advised her of the existence of a copyright in the said house plans.

On May 18, 1961, an attorney claiming to represent DeSilva Construction Corporation, notified defendant Calvin LaHurd by registered mail that it had come to his attention that defendant Wentzel

was about to build a one-family house for defendant Mr. LaHurd, and further advised him that the plans for the "Mc-Call Colonial" had been registered in the United States Copyright Office, and a copyright had been obtained on same by his client; and the attorney warned the defendant, LaHurd, that in the event the plans the said defendant proposed to use in the construction of his house duplicated the plans for the "McCall Colonial" it would constitute an infringement of said copyright; and the letter further put defendant LaHurd on notice that he might be subject to legal liability in the event his house would be similar to the model house on Bird Key built by DeSilva Construction Corporation. At the time the letter was written, the ownership of the copyright issued by the Copyright Office on May 8, 1961, was in the New York corporation.

The defendant, Wentzel, in case No. 4145 Civ. T., is a general contractor in Sarasota, Florida. He first talked to the defendant, Mrs. LaHurd, in 1958 about the possibility of construction of a family home in Sarasota, Florida, for defendants Mr. and Mrs. LaHurd. Nothing developed from those conversations at that time. Defendant Wentzel had a model or show house of his own on Bird Key in February, 1961, and while at his model house on February 10, 1961, he again talked with Mr. and Mrs. LaHurd. Mrs. LaHurd again expressed her desire to have built a four-bedroom house, inquired about the price and asked defendant Wentzel to prepare for her some sketches on the proposed construction. Defendant Wentzel, after having submitted his sketches to Mrs. LaHurd sometime in March, 1961, arrived at a basic agreement with defendants Mr. and Mrs. LaHurd as to the type of house they wanted him to build, and defendant Wentzel completed and finalized his building plans for the LaHurds by the end of March. The parties had entered into an oral agreement for the construction of the house in the early part of March, which agreement was reduced to writing on May 8, 1961. On May 8, 1961, de-

fendant Wentzel, in response to a letter written to him by an attorney, went to see Frank Weissman to inquire about a claim of copyright which was referred to in said attorney's letter. He took with him the house plans of defendants Mr. and Mrs. LaHurd, and inquired of Frank Weissman about the existence of such claimed copyright. Mr. Frank Weissman refused to discuss the matter with defendant Wentzel and refused to show defendant Wentzel any copyrighted plans or notice of copyright and refused to look at the plans in the possession of defendant Wentzel. Mr. Frank Weissman stated, however, that his model house located on Bird Key, and the plans from which said house was constructed, were copyrighted. Thereupon, defendant Wentzel went to the Building Inspector's office in the City of Sarasota in which said plans were filed and checked all the plans on file along with the Building Inspector in order to find out if there was, in fact, a statutory copyright notice contained thereon. Their search proved to be negative, and no plans could be found on file in the Building Department with the statutory copyright notice on them. However, on this visit to the Building Department, defendant Wentzel did see the noncopyrighted building plans submitted by Frank Weissman to the Building Department of the City of Sarasota. He also admits that he saw the picture and the floor plan of the model house which appeared in the "News" as mentioned above. Defendant Wentzel obtained a city permit on May 18, 1961, for the construction of the LaHurd house, and ultimately completed the building of that house.

On May 22, 1961, Frank Weissman, Alan Weissman and Myrtle Weissman, as original subscribers, subscribed to articles of incorporation of a Florida corporation to be known as DeSilva Construction Corporation, and obtained a charter from the Secretary of State of the State of Florida for said corporation on May 24, 1961. This corporation will be hereinafter referred to as the "Florida corporation."

On May 25, 1961, the New York corporation assigned in writing to the Florida corporation the copyright on the said house plans. Said assignment of copyright recited inter alia that the DeSilva Construction Corporation, a New York corporation, assigned, transferred and released all of its rights and interest in and to said building plans known as "McCall Colonial Ranch," and the copyright thereof, including all rights to make copies thereof, to sell, publish, vend or otherwise exploit the same during the present term or any renewal term during which the said work is entitled to a copyright, to the Florida corporation. Said unwitnessed assignment did not assign any cause of action for infringement of said copyright prior to the date of the assignment.

The cases in suit were filed by the plaintiff, the Florida corporation, in the Clerk's Office of this Court in Tampa, Florida, on June 6, 1961.

Although the New York corporation maintained a checking account and the post office box in Sarasota in the State of Florida, the New York corporation never qualified to do business in the State of Florida and was never authorized by the State of Florida to do business in this state. The New York corporation was not dissolved upon the formation of the Florida corporation, and it is still in existence although it has been inactive ever since the Weissman family moved to Florida, with the exception of the payment for construction of the model house built by Frank Weissman as an individual on Bird Key. The record further discloses that the Florida corporation failed to file its annual report and pay annual Florida corporation capital stock tax which was due on July 1, 1961.

The record further reflects that the plaintiff corporation was delinquent in filing its annual report with the Secretary of State of the State of Florida and in paying the required Florida corporation capital stock tax up to the date of trial. However, testimony introduced during trial revealed that the plaintiff corporation filed said annual report and paid said corporation capital stock tax during the pendency of the trial. The Court, therefore, finds that the previously existing delinquency of the plaintiff corporation with regard to compliance with the Florida corporation laws is now cured.

Although the complaint alleges the ownership by the plaintiff of the copyright in suit at all times since the date of its first publication, March 30, 1961, the record is clear and uncontradicted that the plaintiff corporation did not acquire the copyright in suit until the execution of the assignment thereof on May 25, 1961. The complaint did not allege said assignment. Upon the oral motion made by the plaintiff during the trial for leave to amend the complaint to show said assignment, the Court granted said motion.

Before embarking on a discussion of the various contentions raised by the defendants in defense of these actions, it is well to mention that count two of the respective complaints charges a cause of action for unfair competition by the respective defendants; and the pleadings reveal that the defendant, DeAngelis, filed a counterclaim in case No. 4146 Civ. T. against the plaintiff charging trade libel. The plaintiff did not introduce any evidence other than the evidence adduced in support of the copyright infringement, and the defendant, DeAngelis, failed to introduce any evidence in support of his counterclaim.

The defendants' attack on the copyright infringement claims of the plaintiff is based on several grounds:

1. The defendants challenge the right of the named plaintiff to maintain these actions on the ground that, by virtue of § 608.35 of F.S.A., it is disqualified to sue due to its failure to make the required annual report and its failure to pay the required corporate capital stock tax.

Inasmuch as this delinquency—which admittedly existed at the time the suit was filed—is no longer a fact and is

now cured, this contention is plainly without merit. The statute relied on by the defendants does not preclude the institution of suits, but merely suspends the right to maintain suits by corporations who are delinquent; and an action filed by a delinquent corporation is only stayed until the corporation complies with the requirements of the law. (7 Fla.Jur. 607–608. Burton v. Oliver Farm Equipment Sales Co., 121 Fla. 148, 163 So. 468.)

2. The next contention advanced by the defendants involves the assignment of the copyright in suit.

(a) First, they contend that the copyright in suit is invalid because the name of the assignee, as claimant, was inserted in the notice of copyright prior to the recordation of the assignment in the United States Copyright Office, in violation of the terms of § 32, Title 17 U.S.C.A., and on the further ground that the insertion of the name of the assignee, as claimant, in the notice of copyright prior to the recordation of the assignment in the Copyright Office was tantamount to a dedication to the public of the architectural plans, which dedication would vitiate any statutory copyright, citing Group Publishers v. Winchell, 86 F.Supp. 573, So.Dist. of N.Y. (1949.)

The argument advanced and the law cited in support thereof is a sound one and it would be helpful to the defendants if the facts in this case would justify its application. This, however, is not the case. The name inserted in the notice of copyright, even though it was not clearly so indicated, is the name of the New York corporation. In the light of all the facts in these cases, and in the light of the non-existence of the Florida corporation at the time the insertion was made and the claim of copyright issued, it is reasonable to conclude that the name stated on said documents referred to the New York corporation and not to the Florida corporation.

(b) Second, with regard to the plaintiff's title to the copyright in suit, the defendants further contend that the assignment did not transfer any interest to the plaintiff, the Florida corporation, because it was never recorded in the United States Copyright Office as required by the copyright laws of the United States (17 U.S.C.A. § 30.)

This contention is also without merit. Failure to record an assignment in the Copyright Office does not invalidate the document as between the parties. Neither is it available as a defense to an infringer. (New Fiction Publishing Co. v. Star Co., 2 Cir., 220 F. 994.) The plaintiff is the real party in interest and is entitled to bring these actions, and the New York corporation is not an indispensable party to these actions. (Moore's Fed.Practice, 2d Ed. (1948), Vol. 3, § 17.11(2), page 1363.)

(c) Third, defendants contend that plaintiff cannot prevail, even though the real party of interest, unless the assignment in question confers the right to sue for acts of infringement which took place prior to the execution of said assignment.

The assignment in question was admittedly executed after the alleged acts of infringement took place in either of the cases. The plans for the Herrald house were completed in early March, 1961, and the last possible act of infringement took place before the assignment was executed. The plans for the LaHurd house were finalized several weeks before the execution of the assignment and were filed in the Building Department of the City of Sarasota on May 18, 1961, prior to the date of assignment. The assignment as written and executed does not purport to grant the assignee any right to sue for infringements antedating the assignment and, in the opinion of the Court, no such right is conferred by the assignment. As stated on pages 543–544 by Ball in his work entitled the "Law of Copyright and Literary Property":

"* * * a mere assignment of a copyright does not of itself transfer to the assignee any cause of action for infringements that occurred prior to the assignment. Unless the

assignment of copyright contains language explicitly transferring causes of action for prior infringements, the assignee cannot maintain a suit for infringements which happened before the effective date of the assignment. Thus, where the words of assignment are 'assign, transfer, grant and convey' a certain copyright (described in the instrument), 'together with all rights now existing,' without expressly mentioning causes of action, the assignee cannot maintain a suit for past infringements, since the language of the assignment is used strictly and solely with reference to the copyright itself."

Although the case law on these points is not extensive, the authorities considering this question appear to be unanimous that only the owner of the copyright at the time of the infringement is entitled to bring actions for same in the absence of an express provision in the assignment conferring the cause of action. (Kriger v. MacFadden Publications, Inc., D.C., 43 F.Supp. 170; Moore v. Marsh, 7 Wall. 515, 74 U.S. 515, 19 L.Ed. 37; Manning v. Miller Music Corp., D.C., 174 F.Supp. 192.)

■■ The plaintiff, in an attempt to overcome the uncontradicted facts and the law as stated, contends that inasmuch as the assignor and the assignee were so-called "family" corporations, it is reasonable to infer and imply that the assignment executed on May 25, 1961, intended to and did confer the right to sue for acts of infringement antedating said assignment. The plaintiff further claims, in support of this contention, that there existed such community of interests and identity between the two corporations that it would be unjust to apply the law as cited; and in spite of any lack of provision in said assignment, it should be permitted to maintain these actions. Although the plaintiff does not explicitly contend that the Florida corporation is an alter ego of the New York corporation, the thrust of its argu-ment amounts to the same. With regard to plaintiff's argument, it will suffice to state that the individual officers and stockholders have voluntarily chosen to conduct their business in a corporate form, both in New York and Florida, and the individual stockholders and directors cannot avail themselves of the corporate shield when it suits their purpose and discard the same when it does not appear advantageous. The individual stockholders and directors did not dissolve their New York corporation upon the formation of the Florida corporation, thereby evincing a desire to maintain two distinct corporate entities. If that is so, the so-called "family corporation doctrine," which is unknown to the law, does not help the plaintiff in this respect. (Volasco Products Company v. Lloyd A. Fry Roofing Company, 6 Cir., 308 F.2d 383, 394 (1962).)

While this conclusion alone would be determinative of these suits, the Court, rather than deciding these cases on this ground alone, will consider all of the contentions of the parties and make its conclusions thereon. Therefore, assuming, but not admitting, that the plaintiff corporation did acquire the right to sue for acts of infringement antedating the date upon which it acquired the copyright in suit, the Court will consider the next contention of the defendants, to-wit, the invalidity of the copyright in suit.

■ Although not mentioned expressly in a separate category in the statutes, architectural plans (including drawings and models) are clearly copyrightable under the present copyright laws under the specified class of drawings or plastic works of scientific or technical nature. (17 U.S.C.A. § 5(i).) This is recognized by the regulations promulgated by the Copyright Office (37 C.F.R. § 202.12(a),) in which architectural plans are referred to as copyrightable under the classification just mentioned; and the Copyright Office has, in fact, made many registrations of copyright claims of architectural plans.

 However, the Copyright Act of 1947, 61 Stat. 652, 17 U.S.C.A. § 1 et seq., provides:

"No copyright shall subsist in the original text of any work which is in the public domain, * * *." (17 U.S.C.A. § 8.)

Therefore, in order to determine the validity of the copyright in suit, the question whether or not the architectural plans involved in these controversies were in the public domain prior to the alleged acquisition by the plaintiff's assignor is of paramount importance. In order to find the answer to this question, consideration must be given to the duration of the common law copyright of the plaintiff's assignor in the plans in question, even though the plaintiff does not claim protection of the common law copyright as such but claims an infringement of its statutory copyright.

 The common law copyright and the statutory copyright cannot co-exist. Since the only right the author has under the common law copyright is the right of first publication, common law copyrights are lost through publication; and if the right of the author is not preserved promptly by a proper compliance with the statute whereby the statutory copyright is secured, all rights are lost through publication. (Caliga v. Inter Ocean Newspaper Co., 215 U.S. 182, 188, 30 S.Ct. 38, 54 L.Ed. 150; Bobbs-Merrill v. Straus, 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086, affirming 2 Cir., 147 F. 15; Mifflin v. Dutton, 190 U.S. 265, 23 S.Ct. 771, 47 L.Ed. 1043.) Applying this principle to the cases at bar, if the common law copyright of the plaintiff's assignor terminated and was lost through publication prior to March 30, 1961, the alleged date of the first publication, the words represented by said architectural plans were in public domain; therefore said architectural plans were not copyrightable under the copyright laws of the United States.

In this connection, it is the contention of the defendants that the common law copyright in the architectural plans involved here was lost through publication at least as early as November 22, 1960, when said plans were filed with the Building Inspection Department of the City of Sarasota by Frank Weissman.

Research of counsel and independent research failed to disclose any Federal authority for this proposition. However, state courts, considering the same problem, held, with one exception, that the filing of architectural plans in a public office, even though it is required by statute or ordinance, is tantamount to publication of said plans and amounts to a dedication to the public, terminating the author's common law copyright in said plans. Thus, in Wright v. Eisle, (N.Y.1903), 86 App.Div. 356, 83 N.Y.S. 887, the Court held that the filing of the plans in a public office was the act of the author which constituted a publication to the world which deprived the plaintiff of any exclusive right in the design or in its reproduction. The ruling in this case followed Callaghan v. Myers, 128 U.S. 617, 9 S.Ct. 177, 32 L.Ed. 547, in which it was held by the Supreme Court that the delivery to the Secretary of State, pursuant to a statutory requirement, of a volume of the Illinois Supreme Court Report constituted a publication. (See also Kurfiss v. Cowherd (1938), 233 Mo.App. 397, 121 S.W.2d 282; Gendell v. Orr, 13 Phila. 191 (Ct.Common Pleas, Phila., Pa.1879).) Until the decision by the California Supreme Court in Smith v. Paul, 174 Cal.App.2d 744, 345 P.2d 546, 77 A.L.R.2d 1036, this view appears to have been unanimous.

Text writers considering this problem unanimously subscribe to the view that filing of architectural plans in building departments is tantamount to publication resulting in the loss of the common law copyright in said plans. (18 C.J.S. Copyright and Literary Property § 13a (3) (h). See also Ball, the Law of Copyright and Literary Property, page 132.)

 The contention advanced by the defendants is amply supported by the authorities and by logic, and the Court is of the opinion that the plaintiff's assign-

or lost the common law copyright in the architectural plans on November 22, 1960, when said plans were filed by Frank Weissman with the Building Inspection Department of the City of Sarasota.

It is well to keep in mind that the cases cited above dealt with common law copyrights. The owner of the common law copyright cannot keep his plans secret and at the same time construct a house from the plans because the law requires him to file his plans with the building department prior to the commencement of construction. In a statutory copyright case, the proprietor of the set of the copyrighted plans can protect himself by inserting the required copyright notice on the plans prior to filing said set of plans with the building department. It is no hardship to require architects to comply with the notice requirements of the copyright statute, and there is no excuse for the failure to have a copyright notice on said plans. Public policy further supports this view because the copyright notice serves as a warning to the public that the plans are protected by copyright, and such notice prevents innocent persons from being guilty of copying a set of plans which are claimed by the proprietor to be protected by copyright. The copyright notice serves the further purpose of informing the public of the date of first publication, which, in turn, determines the duration and extent of the monopoly granted by the statute to the proprietor of the copyright.

■ In the light of the foregoing, the architectural plans involved in these controversies became part of the public domain and were dedicated to the public prior to the acquisition of the statutory copyright; therefore they were not copyrightable under § 8 of the Copyright Laws of the United States. As stated in Universal Film Mfg. Co. v. Copperman, 2 Cir., 212 F. 301, 302, with reference to the requirement of the statutory copyright notice:

"Around this method of procuring copyright has grown a great body of case law, the sum of which is that publication with notice of copyright is the essence of compliance with the statute, and publication without such notice amounts to a dedication to the public sufficient to defeat all subsequent efforts at copyright protection." See also Sieff v. Continental Auto Supply, D.C., 39 F.Supp. 683, 686.

■ Defendants further contend that, even if filing of the plans with the Building Inspection Department of the City of Sarasota was not such as to destroy the common law copyright in said plans, the subsequent construction and display of the model house was such a publication as would terminate the common law copyright in the architectural plans from which it was constructed. With this contention the Court does not agree.

■ While the authorities cited treat the filing of the architectural plans with governmental agencies regulating building permits, and the subsequent construction of the building itself, equally, i. e., holding both acts to amount to publication, this view does not bear close analysis. The protection extended by Congress to the proprietor of a copyright in architectural plans does not encompass the protection of the buildings or structures themselves, but it is limited only to the plans. The Copyright Act itself is silent on this point. However, it appears to be the unanimous view of respected text writers that, under the current copyright laws of the United States, the architect does not have the exclusive right to build structures embodied in his technical writings. Thus Ball in his work "The Law of Copyright and Literary Property," states as follows on page 396:

"A close analogy exists between an 'architectural work of art' and 'a case involving a copyrighted catalogue containing illustrations of dresses, in which it was held that the protection did not prevent the copying of the dresses and did not

even prohibit their illustration in another catalogue after they had been copied. (National Cloak & Suit Co. v. Standard Mail Order Co. [2 Cir.] 191 F. 528; Baker v. Selden, 101 U.S. 99, 25 L.Ed. 841). This interpretation, if applied to architect's plans, would permit the copying of a constructed building and the subsequent use of plans which might closely resemble the originals. *Protection would be limited to the unauthorized copying or use by another of the original plans themselves.* * * * It seems likely that the Copyright Act (when a case arises on this point) will be interpreted as limiting protection to architectural plans as distinct from *architectural works.'* " (Emphasis supplied.)

See also the article in "Law and Contemporary Problems," published by the School of Law, Duke University (Spring, 1954,) Vol. 2, entitled "Copyright Protection of Architectural Plans, Drawings and Designs" by Arthur S. Katz.

This view is further substantiated by a study published by the United States Copyright Office and prepared by William Strauss, attorney advisor, Copyright Office (August, 1959,) and entitled "Copyright and Architectural Works" where, in summary, it is stated on page seven that copyrighted architectural plans are not now protected against their use in building a structure with the possible exception of a structure which would qualify as a work of art. Various revision bills introduced in Congress between 1924 and 1940 contained provisions for the extension of the protection afforded to architects but so far none of these bills have been enacted by Congress.

■ If the protection of the copyright laws does not extend to the structure or the building itself, but is limited to the plans themselves, it is difficult to perceive how the construction of the building can amount to a publication of the plans themselves. Based on the authorities mentioned above, the Court is of the opinion that the construction of the building does not amount to publication as to render the plans from which the structure was built non-copyrightable under § 8 of the Copyright Act of 1909. (17 U.S.C.A. § 8.) The building is not a copy of the plans; and if the protection is limited under the current law to the plans themselves, the construction of the building would not deprive the architect of his right to secure a copyright of his plans, provided he complies with the requirements of the statute. In the light of the established legal principle that the building of a structure from copyrighted architectural plans is not an infringement of the architectural plans themselves, it is difficult to comprehend how the building of a structure amounts to a publication of the architectural plans themselves.

■ Although in the opinion of the Court the construction of the building by the Weissmans did not amount to a publication of the architectural plans themselves, the general conduct of the Weissmans clearly indicated a voluntary abandonment of any copyright in said plans even without considering the filing by Frank Weissman of said plans with the Building Department of the City of Sarasota. The application filed by Frank Weissman for a building permit was filed by him as an individual for the construction of a home as a private residence, for his own use. During the construction of said home, the Weissmans freely circulated the copies of said architectural plans among their subcontractors. None of the subcontractors were ever warned, or put on notice, that the architectural plans were protected by copyright of any sort. Upon completion of said house, the public was invited to view the house freely, without any restriction imposed upon the public. The exhibition of said house was totally unrestricted and the public was not prevented or prohibited from taking measurements of said house. The advertisement inserted in the "News" depicting said house and showing the floor plan of said house did not show notice of copyright of any type

or any warning or indication that said house, (or the plans thereof,) was protected by copyright. While none of these acts taken in isolation might warrant the conclusion that the plaintiff's assignor evinced an unmistakable intent to abandon any right in said architectural plans, the totality of this evidence, taken as a whole, compels but one conclusion—that neither the Weissmans nor the New York corporation had any idea of claiming any copyright, common law or statutory, until the negotiations for the purchase of their model house with the LaHurds and the Herralds broke down. While it is humanly understandable that the Weissmans were highly aggravated when they realized that two excellent prospects backed down, and especially when they learned that said prospects decided to build houses similar to the model house of the Weissmans through other builders, there is no factual or legal evidence in the record which would justify a conclusion that the common law copyright in said architectural plans was not published and dedicated to the public long before the plaintiff's assignor applied for the statutory copyright. The failure to preserve the common law copyright inviolate and intact until the acquisition of the statutory copyright is, of course, fatal as stated above; and it is the opinion of the Court that the architectural plans were not copyrightable on March 30, 1961, the alleged date of first publication, by virtue of § 8, Title 17 U.S.C.

Lastly, considering the proof of infringement submitted by the plaintiff in this action, it is the finding of the Court that, even assuming, but not admitting, that the copyright in suit is valid, the plaintiff has totally failed to sustain its burden to establish by the preponderance or greater weight of the credible evidence that the defendants, or any of them, infringed on the architectural plans of the plaintiff claimed to have been protected by statutory copyright. By the proof submitted by the plaintiff, it is clear that no alleged acts of infringement took place prior to the date of the first publication of the copyright issued March 30, 1961. The evidence is uncontradicted that none of the defendants ever saw the copyrighted plans, and the most that could be said is that the defendants, DeAngelis and Wentzel, might have had access to the uncopyrighted architectural plans which were on file with the Building Inspection Department of the City of Sarasota.

The plaintiff, however, in an attempt to overcome this unrebutted evidence, asserts, first, that it is possible to copy a set of plans even though the alleged infringer never actually saw the said plans. In this connection the plaintiff contends that the defendants saw the model house; the defendants, DeAngelis and Wentzel, either saw the uncopyrighted plans on file with the Building Inspection Department of the City of Sarasota or at least had access to same; therefore, under the recognized principle of "copying from memory" they are guilty of infringement since, according to the plaintiff, the homes built by defendants DeAngelis and Wentzel for defendants Herralds and LaHurds are so strikingly similar to the model house built by the Weissmans that the conclusion is inescable that the former are copies of the latter. The fallacy of this argument is patent when one considers the fact that the plans that defendants DeAngelis and Wentzel saw, or had access to, were not copyrighted under the statute and were in the public domain by virtue of the act of Frank Weissman in filing same with the Building Inspection Department of the City of Sarasota. Therefore, anyone would have been free to copy the same. Even if established by competent proof that defendants DeAngelis or Wentzel actually copied said plans, there would be no liability for infringement of said uncopyrighted plans. However, there is no evidence in the record to establish the fact that said uncopyrighted plans were, in fact, copied by any of the defendants.

In connection with the allegation that the defendants saw the model house, it will suffice to say that even the plaintiff concedes that the model house was not

protected by any copyright; consequently the defendants could imitate or reproduce said model house without incurring any liability for so doing. While the principle of copying from memory might be a sound one and might be applicable with regard to copying musical compositions, the plaintiff failed to cite any authority to warrant its application with regard to architectural plans. As stated in the case of Rochelle Asparagus Co. v. Princeville Canning Co., D.C.Ill. (1959), 170 F.Supp. 809, which is a case involving labels:

"[E]ven though the alleged infringer may get the idea for his work from a copyrighted work, there is no copyright infringement unless the copyrighted work itself has been copied."

This statement is even more applicable to the case at bar since there is no allegation or proof that the work allegedly copied by the defendants was protected by statutory copyright, and in accordance with the previous statement of the Court was not protected by common law copyright.

▪ Another contention of the plaintiff is that an infringement took place when the defendants filed their competing building plans with the City of Sarasota after March 30, 1961, the alleged date of acquisition of the statutory copyright, and that it is immaterial that the actual mechanical copying took place prior to the acquisition of the statutory copyright, and that, therefore, the defendants are guilty of infringement of the statutory copyright. This contention is also without merit. This argument assumes, without any legal basis, that the architect is entitled, in addition to the right of author specified in the Copyright Act, to performance or execution rights granted to authors of musical compositions and dramatic works. Case law is clearly contrary to the proposition urged.

In the case of Muller v. Triborough Bridge Authority, 43 F.Supp. 298, S.D. N.Y. (1942), the Court held that, even assuming that the defendant had used the plaintiff's drawing in defining and constructing its bridge approach, the plaintiff's copyright was not infringed since it did not prevent anyone from using the system of traffic separation set forth in his drawing. The underlying rationale of the Triborough Bridge case seems to be that a copyright in a drawing or picture of a non-artistic object of utility does not preclude others from making the three-dimensional object portrayed in the drawing or picture. The situation is quite analogous to a trade catalog protected by copyright, depicting ladies' garments. In the case of National Cloak & Suit Co. v. Kaufman, 189 F. 215, M.D.Pa. (1911,) the Court held the copyright in the pictures was not infringed by making the garments depicted. Likewise, the copyright in a drawing of a dress was held not infringed by making such dress. (National Cloak & Suit Co. v. Standard Mail Order, Co., supra.) The copyright in pictures of furniture in a catalog was held not infringed by making such furniture. (Lamb v. Grand Rapids School Furniture Co., 39 F. 474, W.D. Mich. (1889).) These holdings are in accord with the view previously stated that the only monopoly which the copyright gave the author was the exclusive right to reproduce the design as an artistic figure. (Fulmer v. United States, 103 F.Supp. 1021, 122 Ct.Cl. 195 (1952).)

This Court is not willing to read into the current copyright laws that which is not present; and until Congress decides to extend the protection afforded to architects, there is no basis in law to grant such an extension. In the light of the foregoing, it is clear that the filing of their respective building plans by defendants DeAngelis and Wentzel was not an act of infringement even though the architectural plans of the plaintiff were copyrightable and valid.

The plaintiff's claim for unfair competition set forth in count two of the respective complaints was not established and should be dismisssed.

The counterclaim filed by defendant DeAngelis is without foundation in the light of his failure to submit any proof

in support thereof, and should be dismissed.

The costs of this action shall be taxed in favor of the defendants and against the plaintiff, and the defendants are entitled to a judgment dismissing the plaintiff's complaints with prejudice.

Final Decree in accordance with the foregoing will be entered by the Court.

This opinion is considered to satisfy the requirements of Rule 52 of the Federal Rules of Civil Procedure and shall constitute Findings of Fact and Conclusions of Law in this action.