**DATA CASH SYSTEMS, INC., a Florida Corporation, Plaintiff,**

v.

**JS&A GROUP, INC., an Illinois Corporation, Joseph Sugarman, Mary Stanke, Novag Industries, Ltd., Peter W. Auge, and Mitco Industries, Ltd., Defendants.**

No. 79 C 591.

United States District Court,
N. D. Illinois, E. D.

Sept. 26, 1979.

Geraldine Soat Brown, Michael L. Shakman, Devoe, Shadur & Krupp, Chicago, Ill., for plaintiff.

George H. Gerstman, Pigott & Gerstman, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

FLAUM, District Judge:

This action for copyright infringement and unfair competition is brought by the creator of a computer program[1] against the corporations and the officers of these corporations which are allegedly reproducing, importing, distributing, selling, marketing and advertising copies of plaintiff's computer program. Plaintiff has filed a motion for a preliminary injunction and defendants JS&A Group, Inc. ("JS&A"), Joseph Sugarman ("Sugarman"), and Mary Stanke ("Stanke") have filed a motion for summary judgment. For the reasons set forth below, the motion of defendants JS&A, Sugarman and Stanke for summary judgment is granted on Count I of the First Amended Complaint for Infringement of Copyright and for Unfair Competition (the "First Amended Complaint") and is denied on Count II of the First Amended Complaint and the motion of plaintiff for a preliminary injunction is denied.

Before discussing the facts in this case, it is necessary to set forth what exactly a computer program is. A computer program has been defined generally as a set of precise instructions that tells the computer how to solve a problem. C. J. Sippl & C. P. Sippl, Computer Dictionary 333 (2d ed. 1974); *Synercom Technology, Inc. v. University Computing Co.*, 462 F.Supp. 1003, 1005 (N.D.Tex.1978). Normally, a computer program consists of several phases which may be summarized as follows. The first phase is the development of a flow chart which is a schematic representation of the program's logic. It sets forth the logical steps involved in solving a given problem. The second phase is the development of a "source program" which is a translation of the flow chart into computer programming language, such as FORTRAN or COBOL. Source programs may be punched on decks of cards or imprinted on discs, tapes or drums. The third phase is the development of an "assembly program" which is a translation of the programming language into machine language, *i.e.*, mechanically readable computer language. Unlike source programs, which are readable by trained programmers, assembly programs are virtually unintelligible except by the computer itself. Finally, the fourth phase is the development of an "object program" which is a conversion of the machine language into a device commanding a series of electrical impulses. Object programs, which enter into the mechanical process itself, cannot be read without the aid of special equipment and cannot be understood by even the most highly trained programmers. J. Brown & R. Workman, How a Computer System Works 149–175 (1976); Keplinger, Computer Intellectual Property Claims: Computer Software & Data Base Protection, 1977 Wash.L.Q. 461, 464; M. Pope & P. Pope, Protection of Proprietary Interests in Computer Software, 30 Ala.L.Rev. 527, 530–31 (1979).

Thus, at some point in its development, a computer program is embodied in material form and becomes a mechanical device which is engaged in the computer to be an essential part of the mechanical process. At different times, then, a given program is both "source" and "object". The "source program" is a writing while the "object program" is a mechanical tool or machine part.

In this case plaintiff retained an independent consultant, D. B. Goodrich and Associates, to design and develop a computer program for a computerized chess game, CompuChess, which was to be manufactured and sold by plaintiff. From September

---

1. In the industry computer programs are collectively known as computer software, as distinguished from computer hardware, *i.e.*, the physical equipment itself. 21 Cath.L.Rev. 181 n.2 (1971); *Synercom Technology, Inc. v. University Computing Co.*, 462 F.Supp. 1003, 1005 (N.D.Tex.1978).

1976 to April 1977 D. B. Goodrich and Associates designed and developed the basic instructions which told the computer how to play chess at six different levels of difficulty. This process involved the four phases in the development of a computer program discussed above. The instructions were translated into programming language, the source program, which then was translated into machine language, the assembly program. This assembly program was then used to create the object program, the Read Only Memory (the "ROM"). This ROM was then installed in the computer as part of its circuitry.

Thus, CompuChess is a hand-held computer which uses keyboard and data display devices to input and output information. The human player enters his move on the keyboard device by pressing certain keys and the computer relays its move on the data display device by displaying certain letters and numbers.

In late 1977 plaintiff began to market the CompuChess. No copyright notice appeared anywhere on the ROM, the CompuChess itself, its packaging, or its accompanying literature. The copyright notice did appear, however, on the source program and all copies thereof.[2] In November of 1978 the source program was filed with the Register of Copyrights and on November 28, 1978 a Certificate of Copyright Registration was issued to plaintiff.

In late 1978 defendants JS&A, Sugarman and Stanke began marketing the JS&A Chess Computer. The ROM in the JS&A Chess Computer is identical to the ROM in plaintiff's CompuChess.[3] In early 1979 plaintiff filed this action for copyright infringement and unfair competition.

■ Where, as here, the pleadings, depositions, answers to interrogatories and affidavits show that there is no genuine issue as to any material fact, then summary judgment should go to the party entitled to judgment as a matter of law. However, motions for summary judgment in copyright infringement and unfair competition cases have been generally frowned upon. 6 Moore's Federal Practice ¶¶ 56.17[14] and 56.17[71] (2d ed. 1976). Nevertheless, such motions may be granted for the defendant in a copyright infringement action if, after assuming copying, the court finds that any similarity between the works is insubstantial or that undisputed facts raise a complete defense as a matter of law. 3 Nimmer on Copyright § 12.10 (1979); *Musto v. Meyer*, 434 F.Supp. 32, 36 (S.D.N.Y.1977).

Since the ROM in the JS&A Chess Computer is identical to the ROM in plaintiff's CompuChess, the court can assume that there was direct copying of plaintiff's ROM. However, the undisputed facts show that defendants JS&A, Sugarman and Stanke have a complete defense as a matter of law with respect to plaintiff's claim of copyright infringement.

■ Count I of the First Amended Complaint, the count alleging copyright infringement by defendants JS&A, Sugarman and Stanke, is brought under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (App. 1976) (the "1976 Act"). Although this action should be brought under the 1976 Act, the 1976 Act itself does not apply.[4] Section 117 of the 1976 Act states:

2. Each and every copy of the source program had printed on it the words "Copyrighted by D. B. Goodrich & Associates" and the date when it was printed out. On November 2, 1978, D. B. Goodrich & Associates, Inc. assigned its copyright to plaintiff.

3. Although defendants JS&A, Sugarman and Stanke do not know how the ROM was manufactured by defendant Novag Industries, Inc., defendants JS&A, Sugarman and Stanke and plaintiff have stipulated that the chess computer program of the JS&A Chess Computer is identical to the chess computer program of plaintiff's CompuChess.

4. Even if the 1976 Act did apply, copying of the ROM would not be actionable. Under the 1976 Act "copies" are defined as

"material objects, other than phonorecords, in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. The term "copies" includes the material object,

"this title [title 17] does not afford to the owner of copyright in a work any greater or lesser rights with respect to the use of the work in conjunction with automatic systems capable of storing, processing, retrieving, or transferring information, or in conjunction with any similar device, machine or process, than those afforded to works under the law, whether title 17 or the common law or statutes of a State, in effect on December 31, 1977, as held applicable and construed by a court in an action brought under this title."

The legislative history for section 117 explains that this section was enacted because the problems in the area of computer uses of copyrighted works are not sufficiently developed for a definitive legislative solution.[5] Thus, the purpose of section 117 is to preserve the *status quo*. It is not intended to cut off any rights that existed on December 31, 1977 or to create new rights that might be denied under the predecessor to the 1976 Act, the Copyright Act of 1909, 17 U.S.C. § 1 (1976) (the "1909 Act"), or under common law principles applicable on December 31, 1977. H.R.Rep.No.94–1476, 94th

Cong., 2d Sess. 116, *reprinted in* [1976] U.S. Code Cong. & Admin.News, pp. 5659, 5731.

▮ Therefore, a court, in deciding the scope of exclusive rights in the computer area, first must determine the applicable law, whether state statutory or common law or the 1909 Act. After determining which law is applicable, the court's decision must depend upon its interpretation of what that law was on December 31, 1977. H.R.Rep.No.94–1476, 94th Cong., 2d Sess. 116, *reprinted in* [1976] U.S.Code Cong. & Admin.News, p. 5731. If, as of the date of the alleged act of infringement, the computer program allegedly infringed had been neither published nor registered in the copyright office, then the common law copyright rule should be applied. Otherwise, the law under the 1909 Act should be applied. 1 Nimmer on Copyright § 2.08[D], at 2–106 (1979).

▮ Prior to the complete revision of the 1909 Act, the American law of copyright had been the subject of a dichotomy between federal and state law. Unpublished works were automatically protected by

other than a phonorecord, in which the work is first fixed." 17 U.S.C. § 101 (App.1976). While the new definition of copy encompasses works which may be perceived "with the aid of a machine or device," the court believes that the 1976 Act applies to computer programs in their flow chart, source and assembly phases but not in their object phase, *i.e.*, the ROM, for the following reasons:

(1) Proposed Regulation § 201.20, which sets forth the suggested methods of affixing and positioning the copyright notice on various types of works in order to satisfy the requirement in section 401(c) of the 1976 Act, 17 U.S.C. § 401(c) (App.1976), that the copyright notice "be affixed to the copies in such manner and location as to give reasonable notice of the claim of copyright," states:

"(g) Works Reproduced in Machine-Readable Copies. For works reproduced in machine-readable copies (such as magnetic tapes or disks, punched cards, or the like) from which the work cannot ordinarily be visually perceived except with the aid of a machine or device, the following constitute examples of acceptable methods of affixation and position of the notice:

(1) A notice embodied in the copies in machine-readable form in such a manner that on visually perceptible printouts it appears ei-

ther with or near the title, or at the end of the work;

(2) A notice that is displayed at the user's terminal at sign on;

(3) A notice that is continuously on terminal display;

(4) A permanently legible notice reproduced on a gummed or other label securely affixed to the copies or to a box, reel, cartridge, cassette, or other container used as a permanent receptacle for the copies."
Copyright L.Rep. (CCH) ¶ 14,001 (footnote omitted).

(2) In its object phase, the computer program is a mechanical device which is engaged in the computer to become an essential part of the mechanical process. Keplinger, Computer Intellectual Property Claims: Computer Software & Data Base Protection, 1977 Wash.L.Q. 461, 464. Mechanical devices which cannot qualify as pictorial, graphic or sculptural works are not writings and may not obtain copyright protection. 1 Nimmer on Copyright § 2.18[F] (1979).

5. The National Commission on New Technological Uses of Copyrighted Works was established to recommend, *inter alia*, definitive copyright provisions to deal with these problems. Act of Dec. 31, 1974, Pub.L.No.93–573 §§ 201–208, 88 Stat. 1873–1875.

state law, referred to somewhat inaccurately as common law copyright.[6] Such protection began at the moment of creation and terminated upon publication when common law copyright was lost. Thereafter, protection was available, if at all, only through federal, or as it is generally known, statutory copyright. 1 Nimmer on Copyright § 2.02, at 2–16 (1979).

The parties have assumed that the ROM is a "copy" of the computer program created by plaintiff within the meaning of both the common law and the 1909 Act.[7] The court does not agree. Both at common law and under the 1909 Act, a "copy" must be in a form which others can see and read.

At common law the author's property in his unpublished work included the right to publish, or to refrain from publishing, at his option, and the right of restraining others from publishing without his consent. The original manuscript and the incorporeal right of first publication were the private and exclusive property of the author. He had the sole right of first printing and publishing it for sale. Thus, the unauthorized publication of an author's work was a violation of the author's common law right to the "copy". H. Ball, The Law of Copyright and Literary Property § 4 (1944).

At common law the noun "copy" signified a tangible object that was a reproduction of the original work. Although any mode of reproduction, whether by printing, writing, photography, or by some other method not yet invented, constituted a copying, to be a "copy" there must have been an appeal to the eye. Thus, the term "copy" has been defined as that which comes so near to the original as to give to every person seeing it the idea created by the original. 18 Am. Jur. Copyright & Literary Property § 94 (1965) (quoting *Boosey v. Whight*, [1900] 1 Ch. 122).

That the ROM at common law does not constitute a copy of plaintiff's computer program is supported by the cases which hold that a completed building is not a copy of the architectural plans upon which the building is based. *E.g., Nucor Corp. v. Tennessee Forging Steel Service, Inc.*, 476 F.2d 386, 391 n. 8 (8th Cir. 1973); *Smith v. Paul*, 174 Cal.App.2d 744, 345 P.2d 546, 553 (1959). An architectural plan is a technical writing which is capable of being copied only by similar technical writings, *i.e.*, by other plans. A building is the result of plans not a "copy" of them. *Nucor Corp. v. Tennessee Forging Steel Service, Inc.*, 476 F.2d at 391 n. 8 (quoting Katz, Copyright Protection of Architectural Plans, Drawings & Designs, 19 L. & Contemp.Prob. 224, 236 (1954)). It follows that at common law a copy of a computer program is another computer program in its flow chart or source phase because these are comparable technical writings. While the ROM is the mechanical embodiment of the source program, it is not a "copy" of it.

This same conclusion is reached under the 1909 Act. The 1909 Act and its predecessors gave authors the exclusive right, *inter alia*, to copy the copyrighted work. 17 U.S.C. § 1(a) (1976). In *White-Smith Music Publishing Co. v. Apollo Co.*, 209 U.S. 1, 28 S.Ct. 319, 52 L.Ed. 655 (1908), the Supreme Court held that a piano roll[8] was not a "copy" of the musical composition recorded thereon and therefore, that the defendant, in making an unauthorized piano roll of plaintiff's musical composition, had not infringed plaintiff's "right to copy". After quoting the definition of copy set forth in *Boosey v. Whight*, the Supreme Court defined a copy of a musical composition as "a written or printed record of it in intelligible notation". 209 U.S. at 17, 28 S.Ct. at

---

**6.** Although the term "common-law copyright" is not technically and strictly accurate, it is useful and suggestive. More accurate is the term "common-law right of first publication." 18 Am.Jur. Copyright & Literary Property § 2 (1965).

**7.** Since the parties have assumed that the ROM is a "copy" of plaintiff's computer program,

they have perceived the issue here to be whether the sale of the CompuChess, which contains the ROM, was a publication of the computer program. Since the court concludes that the ROM is not a "copy" of the computer program, it need not reach this issue.

**8.** A piano roll is a perforated roll of music used in connection with player pianos.

323. In reaching this result the Court stated:

"It may be true that in a broad sense a mechanical instrument which reproduces a tune copies it; but this is a strained and artificial meaning. When the combination of musical sounds is reproduced to the ear it is the original tune as conceived by the author which is heard. These musical tones are not a copy which appeals to the eye. In no sense can musical sounds which reach us through the sense of hearing be said to be copies as that term is generally understood, and as we believe it was intended to be understood in the statutes under consideration." 209 U.S. at 17, 28 S.Ct. at 323.

Noting that the perforated rolls were parts of a machine which, when duly applied and properly operated in connection with the mechanism to which they were adopted, produced musical tones in harmonious combination, the Supreme Court concluded that they were not "copies" within the meaning of the copyright act then in existence.

Congress in the 1909 Act implicitly adopted the *White-Smith* definition of "copy". 1 Nimmer on Copyright § 2.03[B], at 2–29 (1979). Thus, since the ROM is not in a form which one can "see and read" with the naked eye, it is not a "copy" within the meaning of the 1909 Act. In its object phase, the ROM, the computer program is a mechanical tool or a machine part but it is not a "copy" of the source program.[9]

Dicta in *Synercom Technology, Inc. v. University Computing Co.*, 462 F.Supp. 1003 (N.D.Tex.1978), supports this conclusion. There suit was brought for copyright infringement of instruction manuals and input formats used with a computer program designed to solve engineering problems incident to the analysis of building structures.[10] The plaintiff argued that the sequencing and ordering of data was the expression of an idea, not the idea. After rejecting this argument, the court observed that

the formulation of the problem [to be solved] in sufficient detail and with sufficient precision to enable it to be converted into an unambiguous set of computer instructions requires substantial imagination, creativity, independent thought, and exercise of discretion, and the resulting program can in no way be said to be merely a copy or version of the problem statement. The program and the statement are so different, both in physical characteristics and in intended purpose, that they are really two different expressions of the same idea, rather than two different versions of the same expression. 462 F.Supp. at 1013 n.5.

Even assuming that the ROM in plaintiff's CompuChess was copied by defendants JS&A, Sugarman and Stanke, the ROM is not a "copy" of plaintiff's computer program and therefore the copying is not actionable. Since a complete defense as a matter of law with respect to plaintiff's claim of copyright infringement exists, the motion of defendants JS&A, Sugarman and Stanke for summary judgment is granted on Count I of the First Amended Complaint.[11]

In Count II of the First Amended Complaint, it is alleged that defendants JS&A, Sugarman and Stanke have engaged in unfair trade practices and unfair competition against plaintiff by importing, distributing, selling, marketing and advertis-

---

9. A structure is not a copy of the architectural plans upon which the structure is based under the 1909 Act, as at common law. *E.g., DeSilva Construction Corp. v. Herrald*, 213 F.Supp. 184, 196 (M.D.Fla.1962). Thus, the conclusion that the ROM is not a "copy" of the source program under the 1909 Act could be supported on that ground also.

10. In using a computer program, it is necessary to have a format for input so that the input of data and the instruction to the computer are compatible with its program. *Synercom Technology, Inc. v. University Computing Co.*, 462 F.Supp. at 1005.

11. Since defendants JS&A, Sugarman and Stanke have a complete defense as a matter of law with respect to plaintiff's claim of copyright infringement, plaintiff's motion for a preliminary injunction to restrain these defendants from infringing plaintiff's copyright is denied.

ing as its own copies of plaintiff's ROM.[12] Although the facts are undisputed, defendants JS&A, Sugarman and Stanke have not shown that they are entitled to judgment as a matter of law.

■ While the rule may once have been otherwise, unfair competition is not confined to the passing off of the goods of one for those of another and the "palming off" theory is no longer the sole and exclusive criterion in determining the right to relief against unfair competition. There may be unfair competition by misappropriation as well as by misrepresentation, that is, the doctrine of unfair competition has been extended to permit the granting of relief in cases where there was no fraud on the public but where one, for commercial advantage, has misappropriated the benefit or property right of another and has exploited a competitor's business values. 87 C.J.S. Trade-Marks, Trade-Names and Unfair Competition § 13 (1954); R. Callmann, The Law of Unfair Competition, Trademarks & Monopolies § 60.3 (3d ed. 1968); *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918).

Defendants JS&A, Sugarman and Stanke attempt to rebut plaintiff's argument that they misappropriated plaintiff's ROM by relying on two Supreme Court decisions, *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), and *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d

661 (1964). The following statement in *Compco* capsulizes the two decisions:

"Today we have held in *Sears* . . . that when an article is unprotected by a patent or a copyright, state law may not forbid others to copy that article. To forbid copying would interfere with the federal policy, found in Art. I, § 8, cl. 8, of the Constitution and in the implementing federal statutes, of allowing free access to copy whatever the federal patent and copyright laws leave in the public domain."

376 U.S. at 237, 84 S.Ct. at 782. Thus, defendants JS&A, Sugarman and Stanke in essence are arguing that *International News Service* has been overruled *sub silentio* by *Sears* and *Compco*.

However, *Goldstein v. California*, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973), indicates that *Sears* and *Compco* did not overrule *International News Service* and the misappropriation doctrine. R. Callmann, The Law of Unfair Competition, Trademarks & Monopolies § 61.1 (3d ed. Supp.1978). In *Goldstein* a California statute making it a criminal offense to pirate recordings produced by others was challenged and the Supreme Court held *inter alia* that the California statute did not violate the Supremacy Clause of the Constitution. In so holding, the Supreme Court distinguished *Sears* and *Compco* from *Goldstein* on the grounds that in *Sears* and *Compco* the state was giving protection

---

12. The First Amended Complaint alleges that the court has jurisdiction pursuant to 28 U.S.C. § 1338 (1976) which states that district courts have jurisdiction of claims of unfair competition when they are joined with substantial and related claims under the copyright law. However, where there is no jurisdiction of the asserted federal claim, the state claim should be dismissed unless there are other grounds of jurisdiction to support it. 1 Moore's Federal Practice ¶ 0.62[6], at 699 (2d ed. 1979). Although the jurisdictional statement does not contain other grounds of jurisdiction, the court can look at the entire complaint to determine the existence of jurisdiction. Wright & Miller, Federal Practice & Procedure: Civil § 1206 (1969). Since the First Amended Complaint alleges that plaintiff is a corporation organized and existing under the laws of Florida with its principal place of business in Pinellas County,

Florida, that the corporate defendants are organized and exist under the laws of states other than Florida and have their principal places of business in states other than Florida, and that the individual defendants are citizens of states other than Florida, there is diversity of citizenship. Although the First Amended Complaint does not allege the existence of the requisite amount in controversy, information in affidavits in support of plaintiff's motion for a preliminary injunction demonstrates that the amount in controversy exceeds, exclusive of interest and costs, the sum of ten thousand dollars. The court can also look at information outside the complaint to determine the existence of jurisdiction. Wright & Miller, Federal Practice & Procedure: Civil § 1206 (1969). Thus, the court has diversity jurisdiction of the unfair competition claim.

which conflicted with the objectives of the federal patent laws while in *Goldstein* the state was giving protection which did not conflict with any federal law. Since Congress had left the area of sound recordings unprotected, the state was free to act. Thus, states may prohibit the misappropriation of a property right or a commercial advantage of another. R. Callmann, The Law of Unfair Competition, Trademarks & Monopolies § 60.4(c) (3d ed. 1968).

■■■ Since unfair competition is a tort, it is governed by the law of the state which has the most significant relationship to the occurrence and to the parties. Restatement (Second) of Conflict of Laws § 145 (1971); *Ingersoll v. Klein*, 46 Ill.2d 42, 262 N.E.2d 593, 595 (1970). In unfair competition cases the principal location of the defendant's conduct is the contact that usually is given the greatest weight in determining the state which has the most significant relationship. Restatement (Second) of Conflict of Laws § 145, comment f (1971). Thus, with respect to defendants JS&A, Sugarman and Stanke the law of Illinois controls.[13]

■■■ Cases in Illinois indicate that the doctrine of unfair competition has been extended in Illinois to permit relief where one for commercial advantage has misappropriated the property of another. *E.g., Capitol Records, Inc. v. Spies*, 130 Ill.App.2d 429, 264 N.E.2d 874 (1st Dist. 1970). Since the court does not know exactly how the ROM in the JS&A Chess Computer was created,[14] it cannot determine at this time whether defendants' actions constituted unfair com-

petition. Since the undisputed facts presently before the court do not establish that defendants JS&A, Sugarman and Stanke are entitled to judgment as a matter of law, their motion for summary judgment is denied on Count II of the First Amended Complaint.

■■■ In order to obtain a preliminary injunction to restrain the unfair competition of defendants JS&A, Sugarman and Stanke, plaintiff must establish a reasonable probability of success on the merits, irreparable injury, the lack of serious adverse effects on others, and sufficient public interest. *Ekanem v. Health & Hospital Corp. of Marion County*, 589 F.2d 316, 319 (7th Cir. 1978). Here plaintiff has failed to establish any of these four factors.

■■■ Firstly, plaintiff has not established that there is a reasonable probability of success on its claim of unfair competition because it can only speculate as to how the ROM in the CompuChess was duplicated.[15] Thus, at this point in time, the court is unable to determine that there is a substantial likelihood that plaintiff will prevail on the merits.

Secondly, plaintiff has failed to show that it will be irreparably harmed if the injunction does not issue. Plaintiff contends that if a preliminary injunction does not issue, it will suffer lost profits, other damages and injury to its good will and business reputation. However, plaintiff has an adequate remedy at law if it has suffered lost profits and other money damages as a result of the actions of defendants JS&A, Sugarman and

---

13. JS&A is an Illinois corporation and Sugarman and Stanke are citizens of Illinois.

14. Plaintiff and defendants JS&A, Sugarman and Stanke have stipulated that General Instruments Corporation produces and manufactures the ROM contained in the JS&A Chess Computer, that JS&A obtains the ROM from defendant Novag Industries, Ltd., a foreign corporation with its principal place of business in Hong Kong, and that in May of 1978 General Instruments Corporation manufactured the ROM from a punched paper tape received from ASTEC, a Hong Kong company. Plaintiff and defendants JS&A, Sugarman and Stanke speculate that the ROM in plaintiff's CompuChess

was unloaded (*i.e.,* plaintiff's ROM was removed from the CompuChess and installed in a computer interface which decoded the ROM). Once the computer had the complete decoding of the ROM, they speculate that either a computer printout could have been furnished to someone who could have made a ROM identical to plaintiff's ROM or that the information from the computer could have been dumped onto a programmable read only memory ("PROM") which could have been furnished to a ROM manufacturer who could have made a ROM containing plaintiff's computer program.

15. See footnote 14 *supra.*

Stanke. Plaintiff's conclusory statements that its reputation and good will have been damaged do not establish that plaintiff has been irreparably harmed.[16]

Thirdly, the threatened injury to plaintiff may not outweigh the threatened harm to defendants JS&A, Sugarman and Stanke if they are enjoined from reproducing, importing, distributing, selling, marketing and advertising the JS&A Chess Computer. The injury to plaintiff if the preliminary injunction does not issue is a decrease in sales while the injury to defendants JS&A, Sugarman and Stanke if the preliminary injunction does issue is an elimination of sales altogether.

Finally, plaintiff has not convinced the court that the public interest will be served if a preliminary injunction issues. Generally, the public interest is served by freedom of trade and business competition. Absent a showing as to exactly how the ROM in the CompuChess was duplicated, this court does not believe it is in the public interest to enjoin defendants JS&A, Sugarman and Stanke from reproducing, importing, distributing, selling, marketing and advertising the JS&A Chess Computer. Therefore, plaintiff's motion for a preliminary injunction to restrain the unfair competition of defendants JS&A, Sugarman and Stanke is denied.

Accordingly, the motion of plaintiff for a preliminary injunction is denied and the motion of defendants JS&A, Sugarman and Stanke for summary judgment is granted on Count I of the First Amended Complaint and is denied on Count II of the First Amended Complaint.

It is so ordered.

16. The only damages that plaintiff specifically alleges are the decrease in plaintiff's sales since defendants JS&A, Sugarman and Stanke began marketing the JS&A Chess Computer and the refusal of plaintiff's distributors to renew their orders due to competition from defendant JS&A.